UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ROBERT J. WOODSFORD,

                Plaintiff,

    v.

FRIENDLY FORD, a Nevada Corporation, et al.,

                Defendants.

Case No. 2:10-cv-01996-MMD-VCF

**ORDER**

(Motion for Summary Judgment–Dkt. no. 23)

I.    **SUMMARY**

    Before the Court is Defendant Friendly Ford's **Motion for Summary Judgment**. (Dkt. no. 23.)  For the reasons set forth below, the Court grants the motion in part and denies it in part.

II.    **BACKGROUND**

    Except where stated, the following facts appear without dispute in the summary judgment record.  Plaintiff Robert Woodsford began working at Defendant Friendly Ford ("Friendly") in May 1984.  Friendly was founded by its current chairman, Edward Olliges, in 1970.  It is a Ford Motors dealership and service shop.  By August 2008, the time of the first alleged act of discrimination, Woodsford was senior shop foreman and 67 years of age.

    As of August 29, 2008, Woodsford received a monthly salary of $1800 plus a commission of 2.50% on the selling gross for parts and service.  Woodsford's

1 | compensation under this pay plan from 2005-2008 was between $150,000 and $171,000
2 | per year.

3 |     In summer 2008, Friendly was in the midst of a downturn in business and made
4 | numerous cuts in personnel and expenditures.  Fifteen employees were laid off between
5 | August and September of that year.  Woodsford's supervisor and the service director,
6 | Greg Haase, asked Woodsford to reduce costs in his department.

7 |     Earlier in 2008, Haase had conducted a survey of the average pay for shop
8 | foremen at Las Vegas car dealerships.  Haase came to the conclusion that Woodsford
9 | made substantially over market, with other shop foremen making between $70,000 to
10 | $90,000.  In fact, Jerry Penland, the former senior shop foreman, had previously spoken
11 | to Woodsford and Haase about management costs being too high.

12 |     Over the course of Woodsford's employment, he and Olliges had several
13 | conversations in which Woodsford discussed his plans to buy a motorhome to use in
14 | retirement.  (Dkt. no. 23-1 at 11.)  Invariably during these conversations, Olliges asked
15 | Woodsford when he planned on retiring.  (*Id.*)  In fact, Woodsford had previously told co-
16 | workers that he planned on retiring at age 66.  (Dkt. no. 28-1 at 8.)  But in 2008,
17 | Woodsford informed Olliges that he was not going to be able to retire in the near future
18 | for personal reasons.  (*Id.*)  Later, on or about August 1, 2008, Woodsford claims that
19 | Olliges asked Woodsford whether or not he was planning on retiring as he was
20 | approaching 67 years old.[1]  Woodsford responded that he had no plans on retiring for
21 | another "couple" of years.

22 |     On August 29, 2008, Haase informed Woodsford that he was reducing
23 | Woodsford's commission to 1.5% because Woodsford "made too much money."

24 | _____

25 |     [1] Defendant denies that Olliges asked Woodsford directly when Woodsford
26 | planned on retiring.  Instead, Defendant claims that when Woodsford brought up his retirement in Olliges' presence, Olliges would ask "when?"  However, "[i]n evaluating a summary judgment motion, a court views all facts and draws all inferences in the light
27 | most favorable to the nonmoving party."  *Kaiser Cement Corp. v.  Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).  Thus, the Court assumes Woodsford's
28 | version of this fact.

Defendant did not alter Woodsford's job duties; the only change was to his compensation.  Woodsford signed documents agreeing to reduce his commission to 1.5% with an increase in his monthly salary to $2000 on August 29.  Woodsford later had second thoughts and requested meetings with Haase and Olliges to discuss the changes.  Woodsford protested what he perceived to be a steep cut in his compensation and asked for a less significant reduction.  Woodsford also asked the men if the pay cut was Defendant's method of pushing Woodsford to retire; Olliges responded that the pay cut was because Friendly paid Woodsford too much.  After the meeting, Haase and Olliges agreed to modify Woodsford's base salary to $2500 per month, informing Woodsford that if he did not agree to this number, Friendly management would eliminate his position.  On September 3, Woodsford signed a new pay plan providing for 1.5% commission and a salary of $2500 per month.  Haase asked Woodsford not to discuss the changes to his compensation with other Friendly employees.

Woodsford took a vacation after the change in his salary.  While on vacation, on September 9, he filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging age discrimination ("the EEOC charge").  Woodsford believed that because he was the oldest manager and the only manager whose pay had been cut, Friendly was attempting to induce him to retire.  Defendant learned about the charge on September 9.

Back at work on September 15, Woodsford met with Haase and Dennis Young, Friendly's Director of Human Resources.  Young informed Woodsford that Friendly was aware of the EEOC filing.  He asked that Woodsford not discuss his pay cut or the charge with other friendly employees.[2]  Woodsford protested this, saying that his compensation change and EEOC charge were "absolutely everybody's business."

---

[2] The parties dispute whether Friendly personnel asked Woodsford not to discuss the charge and Woodsford's pay cut with other employees at all, as Woodsford claims, or only while at work (Defendant's contention).  However, the Court must construe the facts in a light most favorable to Woodsford.  Further, all parties agree that Woodsford *(fn. cont…)*

1    Later in the day on September 15, Woodsford met with Young and Friendly's

2 Controller, Dan Turner.  Young and Turner asked Woodsford whether he had discussed

3 his compensation reduction with his co-workers.  Woodsford told them that he had

4 spoken with three co-workers about the situation.  Young sent Woodsford home.

5    On or about September 16, Friendly suspended Woodsford until October 1

6 without pay.  Defendant supplied Woodsford with a suspension notice on September 17

7 outlining its reasons for suspending him (Woodsford later signed the form with the

8 comment "signing under protest[;] see amendment").  (Dkt. no. 23-4 at 16.)  The listed

9 reasons for suspending Woodsford were that (1) he violated Young's instruction not to

10 discuss his compensation reduction and the EEOC charge with his co-workers and (2)

11 he informed Friendly management that he no longer trusted or respected them.  (*Id.*)

12    Woodsford returned to work on October 1.  He met with Haase and Young at

13 9 a.m. and presented them with an "amendment" to his suspension which stated, among

14 other things, that Woodsford reserved his right to speak with his co-workers about the

15 EEOC charge while they were not working for the purpose of gathering information.

16 (Dkt. no. 23-4 at 18.)

17    Management informed Woodsford that while he was on suspension, his previous

18 position of senior shop foreman was eliminated.  Woodsford was offered the position of

19 shop foreman (also held by Woodsford's former subordinate, Dave Jacobs).  The shop

20 foreman position consisted of fewer responsibilities and obligations than Woodsford's

21 previous position. The terms of Woodsford's new employment were presented to

22 Woodsford in a three page document and Woodsford was asked to sign on to the terms

23 stated therein.  (Dkt. no. 23-4 at 20-22.)

24    Woodsford refused to sign on to the terms of his new job description.  At one point

25 during the October 1 meeting, Woodsford asked Haase, "why don't you just fire me?"

26

27 *(…fn cont.)* spoke to his co-workers while on the job, so the parties' dispute on this issue
28 is of no consequence.

4

1
2
3
4

and then said, "you don't have the cojones [Spanish for "balls"] to fire me" (speaking to Haase).  Woodsford informed Young and Haase that he needed time to think about the changes before he could return to work.  The parties agreed that Woodsford would have until that Friday, October 3, to consider the offered job package.

5
6
7
8

However, later in the day on October 1, Young informed Woodsford that Friendly was rescinding the shop foreman offer and was terminating him.  Young told Woodsford that his conduct and statements in that morning's meeting led to the decision. (Dkt. no. 23-4 at 25.)

9
10
11
12

Greg Haase made the ultimate decision to terminate Woodsford.  Neither Woodsford's previous position, senior shop foreman, nor the position offered to him on October 1, shop foreman, were filled.  Defendant transferred most of Woodsford's job duties to Dave Jacobs.

13
14
15
16
17

Woodsford amended his EEOC charge to include a retaliation claim.   The EEOC gave Woodsford a right to sue letter on August 13, 2010.   On October 27, 2010, Woodsford filed a complaint in Nevada's Eighth Judicial District against Defendant alleging disparate treatment and retaliation under the ADEA, 29 U.S.C. § 623(a), (d) and Chapter 613 of the Nevada Revised Statutes.[3]  Defendant timely removed to this Court.

18

**III.    DISCUSSION**

19

**A.    Legal Standard**

20
21
22
23
24

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

25

26
27
28

[3] The Court analyzes the state and federal claims jointly because the relevant statutes are nearly identical and the Nevada Supreme Court tends to follow and apply federal case law on the subject.  *See, e.g., Apececeche v. White Pine Co.*, 615 P.2d 975,726 (Nev. 1980).

matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996).  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).  In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party.  *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact.  *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).   Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of America*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).

1   "The mere existence of a scintilla of evidence in support of the plaintiff's position will be

2   insufficient." *Anderson*, 477 U.S. at 252.

3       **B.    Disparate Treatment**

4       Plaintiff argues that several of Defendant's decisions regarding his employment

5   constitute disparate treatment:  (1) the reduction in compensation; (2) the suspension;

6   (3) the demotion; and (4) the termination.   The Court grants Defendant's motion for

7   summary judgment regarding all of these claims.

8       "In order to establish a disparate treatment claim, the plaintiff must produce

9   evidence that gives rise to an inference of unlawful discrimination, either through direct

10  evidence of discriminatory intent or through the burden shifting framework set forth in

11  *McDonnell Douglas Corp. v. Green*."  *Vasquez v. County of Los Angeles,* 349 F.3d 634,

12  640 (9th Cir.2003); *see also Shelley v. Geren*, 666 F.3d 599, 608 (9th Cir. 2012) (holding

13  that the *McDonnell Douglas* framework is still applicable to motions for summary

14  judgment on ADEA claims after the Supreme Court's decision in *Gross v. FBL Financial

15  Servs., Inc.*, 557 U.S. 167, 176 (2009)).  "Under this framework, the employee must first

16  establish a prima facie case of age discrimination."  *Diaz v. Eagle Produce Ltd. P'ship*,

17  521 F.3d 1201, 1207 (9th Cir. 2008) (internal citations omitted).  "If the employee has

18  justified a presumption of discrimination, the burden shifts to the employer to articulate a

19  legitimate, non-discriminatory reason for its adverse employment action."  *Id.*  "If the

20  employer satisfies its burden, the employee must then prove that the reason advanced

21  by the employer constitutes mere pretext for unlawful discrimination."  *Id.*  Further, to

22  successfully establish an ADEA disparate treatment claim, the plaintiff must prove that

23  age was the "but-for" cause of the employer's adverse decision.  *Gross*, 557 U.S. at 176

24  ("the ordinary meaning of the ADEA's requirement that an employer took adverse action

25  'because of' age is that age was the 'reason' that the employer decided to act.")

26  ///

27  ///

28  ///

7

1          **1.     Defendant's Decision to Reduce Woodsford's Compensation**

2               **a.  Prima Facie Case**

3                    **i.    Direct Evidence[4]**

4          Woodsford provides two pieces of potentially discriminatory evidence, both

5     occurring in 2008 before Defendant's decision to reduce his compensation: first, Olliges

6     asked him when he planned on retiring,[5] and second, Haase and Olliges asked him if he

7     was collecting social security benefits (dkt. no. 23-2 at 6).

8          "Direct evidence is evidence which, if believed, proves the fact of discriminatory

9     animus without inference or presumption."  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d

10    1217, 1221 (9th Cir. 1998) (citation omitted).  In the context of an ADEA claim, direct

11    evidence "is defined as evidence of conduct or statements by persons involved in the

12    decision-making process that may be viewed as directly reflecting the alleged

13    discriminatory attitude sufficient to permit the fact finder to infer that that attitude was

14    more likely than not a motivating factor in the employer's decision." *Enlow v. Salem-*

15    *Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) (citation, internal

16    quotation marks, and ellipses omitted).

17         The remarks made to Woodsford by Olliges and Haase were not onerous enough

18    to constitute direct evidence of age discrimination.  In general, "stray remarks" are

19    insufficient to establish discrimination.  *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434,

20    1438 (9th Cir. 1990) (citations omitted); *see also Rose v. Wells Fargo & Co.*, 902 F.2d

21    1417, 1420-21 (9th Cir.1990) (use of the phrase "old-boy network" did not support

22    inference of discriminatory motive).  For example, in *Shorette v. Rite Aid of Maine*, 155

23    F.3d 8, 13 (1st Cir. 1998), a manager asked the plaintiff how old he was and when he

24    _____

25         [4] "When a plaintiff alleges disparate treatment based on direct evidence in an
26    ADEA claim, [courts] do not apply the [*McDonnell-Douglas*] burden-shifting analysis . .
      ..".) *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004).

27         [5] Woodsford incorrectly asserts that this constitutes circumstantial evidence.  (Dkt.
28    no. 25 at 20).

1  planned on retiring.  The First Circuit called this a "textbook example of an isolated

2  remark which demonstrates nothing."  *Id.*

### b.  Circumstantial Evidence

4      A plaintiff can establish a prima facie case of disparate treatment under the ADEA

5  with circumstantial evidence by demonstrating that he was (1) a member of the protected

6  class (at least age 40); (2) performing his job satisfactorily; (3) subject to an adverse

7  employment decision; and (4) either replaced by a substantially younger employee with

8  equal or inferior qualifications or that there were circumstances otherwise "giving rise to

9  an inference of age discrimination."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281

10  (9th Cir. 2000).[6]

11      Woodsford can establish a prima facie case.  He was 67 years old at the time of

12  the alleged discrimination, there is no evidence of unsatisfactory performance before

13  Defendant's August 29 decision to alter Woodsford's compensation, and the August 29

14  pay cut constitutes an adverse employment action.  *See Ray v. Henderson*, 217 F.3d

15  1234, 1241 (9th Cir. 2000) (noting that the Ninth Circuit takes an "expansive view of the

16  type of actions that can be considered adverse employment actions," and that such

17  "employment actions include demotions, disadvantageous transfers or assignments,

18  refusals to promote, unwarranted negative job evaluations and toleration of harassment

19  by other employees." (citation omitted)).

### c.  Defendant's Non-Discriminatory Business Reason

21      Defendant's proffered non-discriminatory legitimate business reason was its need

22  to make cuts during the 2008 economic downturn.  To that end, Friendly sought to

23  reduce costs in the service department, and claims that it reduced Woodsford's

24  compensation accordingly.  An economic downturn is a legitimate, non-discriminatory

---

27      [6] In this instance, element (4) is not at issue because Woodsford kept all of his

28  duties.

1    reason for making an adverse business decision.   *See Fu v. Walker Parking*

2    *Consultants*, 796 F. Supp. 2d 1148, 1156 (N.D. Cal. 2011).

3                                    **d. Pretext**

4          "Circumstantial evidence of pretext must be specific and substantial in order to

5    survive summary judgment."   *Bergene v. Salt River Project Agr. Imp. and Power Dist.*,

6    272 F.3d 1136, 1142 (9th Cir. 2001).   "A showing that the [employer] treated similarly

7    situated employees outside [the plaintiff's] protected class more favorably [is] probative

8    of pretext."

9          The parties dispute whether Woodsford was treated differently than similarly-

10   situated employees.   Woodsford argues that Friendly treated him differently than

11   similarly-situated managers while Defendant argues that there *were no* similarly-situated

12   employees to Woodsford; rather, he was in an employee class of his own.

13         There were four employees at Friendly Ford who were paid off of the "pay line"–

14   paid a percentage of the selling gross of the parts and service departments.   (Dkt. no.

15   28-1 at 24-25.)   Woodsford was the oldest of these employees and the only one who

16   had his pay reduced.   Defendant argues that none of these employees were similarly

17   situated to Woodsford, primarily because, out of the four managers, Haase controlled

18   only Woodsford's pay.   (Dkt. No. 28-1 at 26.)   Plaintiff does not dispute that Haas made

19   the decision to reduce his pay.

20         "In order to show that the 'employees' allegedly receiving more favorable

21   treatment are similarly situated . . . the individuals seeking relief must demonstrate, at

22   the least, that they are similarly situated to those employees in all material respects."

23   *Moran v. Selig,* 447 F.3d 748, 755 (9th Cir. 2006). "[I]ndividuals are similarly situated

24   when they have similar jobs and display similar conduct."   *Vasquez*, 349 F.3d at 641.

25         Woodsford was not similarly situated to the two men in the parts department who

26   were paid off the pay line, Rob Mancini and Jason Gonzales. They did not work in the

27   same department as Woodsford and their compensation does not relate to Haase's goal

28   and stated reason for reducing Woodsford's pay – cutting department costs.  Nor was

1    Woodsford similarly situated to Haase.  Whether or not Haase and Woodsford were
2    similarly situated is admittedly a closer question.  Woodsford and Haase were both in
3    management and both worked in the service department. Haase could have made the
4    decision to decrease both Woodsford's salary and his own.  However, Haase was
5    Woodsford's manager, and "[e]mployees in supervisory positions are generally deemed
6    not to be similarly situated to lower level employees." *Vasquez*, 349 F.3d at 641.  This is
7    not a steadfast rule; the "critical question is whether the plaintiff and the other employee
8    are similarly situated in all *material* aspects."  *Bowden v. Potter*, 308 F. Supp. 2d 1108,
9    1117 (N.D. Cal. 2004) (citations omitted, emphasis in original).  Haase and Woodsford
10   had different levels of seniority and performed different roles.  While Woodsford ran the
11   service shop, Haase oversaw the service department, and it was Haase's job to perform
12   research about the financial health of that department and make decisions accordingly.
13   The Court finds that the two were not "similarly situated."

14        Further, Defendant presents additional evidence that Woodsford's compensation
15   was reduced because of an economic downturn and not because of age.  First, Friendly
16   was experiencing a downturn in business at the time it reduced Woodsford's
17   compensation.  To that end, it laid off fifteen employees earlier in 2008.  Second, Haase
18   conducted a survey and came to the conclusion that Friendly paid Woodsford
19   significantly more than other shop foremen working in the Las Vegas area.  Third, Haase
20   had previously informed Woodsford that management costs in the service department
21   were too high.  Finally, in previous years, Jerry Penland, Haase's predecessor, told
22   Woodsford and Haase that management costs in the service department were too high.
23   Essentially, Friendly argues that it was experiencing a drastic downturn in business, and
24   made the decision to cut the compensation of one highly overpaid employee.

25        Woodsford counters that it makes "no sense" to "put the entire burden of cutting
26   management costs on the oldest manager and not to reduce the younger manager[s']
27   [pay] at all."  (Dkt. no. 25 at 24.)  "[T]he quality of [an employer's] business judgment is
28   only relevant insofar as it suggests that his decisions were explainable only as the

product of illegal discrimination." *See Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1099 (9th Cir. 2005). The circumstances surrounding Woodsford's pay decrease could potentially lead a juror to determine that Woodsford's age was *one* factor in Friendly's decision. Haase made the decision to cut the pay of a long-time employee who had worked his way up the ranks, and who had previously told his co-workers that he was planning on retiring at 66. Rather, during the midst of an economic downturn, he informed his employers that he no longer planned on retiring in the foreseeable future. Instead of asking Woodsford to make additional cuts in his department or working to reduce management costs by making more modest decreases across management, Haase decreased only Woodsford's commission. He decreased it by one percentage point, a decrease in pay which both parties agree was approximately 40% of Woodsford's compensation before the reduction. These circumstances could potentially lead a juror to conclude that Friendly made such a significant cut to Woodsford, and Woodsford alone (out of the managers), in order to induce him to retire or quit, as Plaintiff argues. (Dkt. no. 25 at 31.) However, while such evidence would potentially suffice under a mixed-motives theory of discrimination, Defendant's evidence supporting its non-discriminatory reason for cutting Woodsford's pay, coupled with the fact that there is no evidence of Woodsford's being treated differently than similarly-situated employees, does not suffice under the but-for standard. *See Gross*, 557 U.S. at 176. Because of the substantial evidence that Friendly's decision was guided by economic considerations rather than purely age-based ones, no reasonable juror could determine that but for Woodsford's age Friendly would not have reduced his compensation.

### 2.   Defendant's Decisions to Suspend, Demote, and Terminate Woodsford

To the extent that Woodsford argues that Defendant's decisions to suspend, demote, and/or terminate him constitute disparate treatment, the Court also grants summary judgment in Defendant's favor. Woodsford cannot establish a prima facie case of disparate treatment for these claims. Here, Defendant's disciplinary actions are prima

1  facie evidence of disparate treatment if Woodsford can establish that he was (1) in the

2  protected class; (2) performing his job satisfactorily;[7] (3) subject to an adverse

3  employment decision; and (4) that the circumstances surrounding the employment

4  decisions gave rise to an inference of discrimination. *See Sorbo v. United Parcel Serv.*,

5  432 F.3d 1169, 1173 (10th Cir. 2005) (noting that in cases involving an employer's

6  disciplinary actions, the requirement that plaintiff be treated differently than similarly-

7  situated employees is an outmoded, often inapplicable requirement).

8       Woodsford cannot satisfy the fourth element.  There are no other circumstances

9  giving rise to an inference of age discrimination here.  Defendant's decision to suspend,

10  demote, and terminate Woodsford were disciplinary actions, allegedly relating to his

11  decisions to file an EEOC charge and discuss the charge with his co-workers.  They

12  were not associated with anything else.  These claims therefore relate to Defendant's

13  alleged retaliation against Woodsford for opposing Defendant's actions, and not to the

14  original instance of alleged discrimination.  *See* 44 Am. Jur. Proof of Facts 3d 79 (1997)

15  ("A claim of retaliation will lie for adverse employment action taken as a result of the

16  plaintiff's efforts to document that the employer engaged in age discrimination").  The

17  Court therefore grants summary judgment on these claims.

18      **C.  Retaliation**

19       The Court denies the motion regarding Woodsford's retaliation claims. There

20  exists a genuine issue of material fact as to whether Defendant's decisions to suspend,

21  demote, and terminate Woodsford constitute unlawful retaliation under the ADEA.

22

23

----

24     [7] Defendant argues that Woodsford was not performing his job satisfactorily

25  during the time Defendant made the decisions to suspend, demote, and terminate Woodsford.  Insofar as this argument relates to Woodsford's suspension, Defendants

26  argue that Woodsford's performance was unsatisfactory because he spoke with fellow employees about his EEOC charge while on the job.  As discussed in detail below, there

27  is a genuine issue of material fact as to whether Woodsford's conversations were of a type protected by the ADEA.  It would contradict the spirit of the Act to allow an employer

28  to use the fact that a plaintiff engaged in protected activity as evidence of sub-par job performance.

1    Courts utilize the same 3-part burden-shifting test in ADEA retaliation cases and

2    ADEA disparate impact cases.  *Ray*, 217 F.3d at 1240.

3              **1.    Woodsford's Sept. 16 Suspension and Subsequent Demotion**

4                   **a.  Prima Facie Case**

5    To establish a claim of retaliation, a plaintiff must prove that (1) he engaged in a

6    protected activity; (2) he suffered an adverse employment action; and (3) there was a

7    causal link between the plaintiff's protected activity and the adverse employment action.

8    *Poland v. Chertoff*, 494 F.3d 1174, 1179-80 (9th Cir. 2007).

9              There are two types of protected activities under 29 U.S.C. § 623(d): opposing

10   any practice made unlawful by the section (the "opposition clause") or filing a charge or

11   otherwise participating in any manner in an investigation, proceeding, or litigation under

12   the ADEA (the "filing and participating" clause).  29 U.S.C. § 623(d).  For the purposes of

13   this motion, Defendant does not contest that Woodsford can establish a prima facie case

14   under the participation clause because of the temporal proximity between Woodsford's

15   filing of the EEOC charge and Defendant's adverse employment actions.  (Dkt. no. 23 at

16   16.)  However, the parties dispute whether Woodsford's discussions with his co-workers

17   regarding the charge constitute protected opposition to discrimination.  In one sense, it is

18   inconsequential whether Woodsford's conversations are protected: the parties agree for

19   the purposes of this motion that Plaintiff can establish a prima facie case under the "filing

20   and participating clause," so the burden shifts to Defendant to prove that it had a

21   legitimate business reason for its disciplinary actions. However, whether or not

22   Woodsford's conversations are protected by the ADEA relates to the second stage of the

23   *McDonnell-Douglas* burden-shifting analysis.   Defendant's stated non-discriminatory

24   reason for suspending and demoting Woodsford is his "insubordinate behavior," and the

25   conversations are Defendant's evidence of such behavior.  If these conversations are

26   protected under the ADEA, they do not constitute insubordinate behavior, and are not a

27   legitimate reason for Defendant's adverse employment decisions.   Thus, the Court

28   considers whether Woodsford's conversations with his employees are protected under

1  the Act here.  For the reasons stated below, the Court holds that a reasonable juror

2  could find that Woodsford's activity constitutes protected opposition.

3             **i.      Protected Activity**

4        Defendant argues that Woodsford was not engaging in a protected activity under

5  the opposition clause when he spoke to non-management Friendly employees while on

6  the job in violation of Defendant's instructions not to do so.  The Ninth Circuit uses a

7  balancing test to determine whether an employee's conduct constitutes a "protected

8  activity" under the ADEA.  *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763

9  (9th Cir. 1996).  "The court must balance the purpose of the Act to protect persons

10  engaging reasonably in activities opposing . . . discrimination, against Congress' equally

11  manifest desire not to tie the hands of employers in the objective selection and control of

12  personnel."  *Id.*  (Internal quotation marks omitted.)  "An employee's opposition activity is

13  protected only if it is reasonable in view of the employer's interest in maintaining a

14  harmonious and efficient operation."  *Id.*  (Internal quotation marks omitted.)

15        Friendly's instruction to Woodsford contradicts the plain language of 29 U.S.C. §

16  623(d):

17      **Opposition to unlawful practices; participation in investigations, proceedings, or litigation**

18      It shall be unlawful for an employer to discriminate against any of his employees .

19      . .  because such individual, member or applicant for membership *has opposed any practice made unlawful by this section*, or because such individual, member

20      or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this

21      chapter.

22  (Emphasis added.)  "Opposing" an unlawful action encompasses speaking to fellow

23  employees about a charge filed *in opposition to* the alleged discrimination.  Further, the

24  EEOC compliance manual lists: "[a] complaint or protest about alleged employment

25  discrimination to a . . . co-worker," as an "example of opposition."  1 EEOC Compl. Man.

26  ///

27  ///

28  ///

§ 8.2(2) (June 1, 2006).[8]  The Court cannot condone an employer's "gag order" on all discrimination-related workplace conversation.  To do so would be detrimental to plaintiffs' attempts to preserve evidence for their case.  *See O'Day*, 79 F.3d at 763.  It could also produce a chilling effect that deters employees with meritorious claims from bringing discrimination suits.

While conversing with fellow employees about an EEOC charge is protected under the ADEA, the Act does not protect such conversation when it becomes disruptive to the workplace.  The ADEA does not safeguard an employee "when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employer, or willfully interferes with the attainment of the employer's goals." *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985).  And an employee may not "disrupt workplace relations as a form of protected 'opposition' of the alleged discrimination and then try to capitalize on the deserved discipline that the employer consequentially imposes."  *Garner v. Motorola, Inc.*, 95 F. Supp. 2d 1069, 1080 (D. Ariz. 2000) *aff'd sub nom. Garner v. Motorola Inc.*, 33 F. App'x 880 (9th Cir. 2002); *see also* 1 EEOC Compl. Man. § 8.2 (3)(a) ("The manner in which an individual protests perceived employment discrimination must be reasonable in order for the anti-retaliation provisions to apply. In applying a 'reasonableness' standard, courts and the Commission balance the right of individuals to oppose employment discrimination and the public's interest in enforcement of the EEO laws against an employer's need for a stable and productive work environment").

A genuine issue of material fact exists as to whether Woodsford's conversations with his co-workers about his EEOC charge were so disruptive in nature that they fall outside the ADEA's protection.  Woodsford spoke to three co-workers about his charge

---

[8] Defendant told Woodsford that his plans to "talk to [his] co-workers to gather evidence and information about [his] EEOC charge" was "clearly unacceptable," and listed this plan as one of the reasons for Woodsford's termination.  But employees have "a legitimate interest in preserving evidence of" an employer's "unlawful employment practices."  *O'Day*, 79 F.3d at 763.

on September 15 – Alberto Gonzales, Cruz Arellano, and Frank Mohr.  (Dkt. no. 25-2 at 44.)    Although Woodsford told his superiors at Friendly that his reduction in compensation and the EEOC charge were "absolutely everybody's business," and that he was going to tell the whole company about it, there is no evidence that he spoke with anyone other than management and Gonzales, Arellano, and Mohr.  Further, there is no evidence that Woodsford's conversations with his co-workers were disruptive in nature.  Defendants do not present evidence that the conversations were overly numerous, loud, or made during particularly inopportune moments (*e.g.*, during a meeting or when the employees were with customers).  In fact, Woodsford states that he spoke with them while they were on break (dkt. no. 25-1 at 10).  Woodsford's actions are far less disruptive than that of plaintiffs in cases where courts have found disruptive behavior.  For example, in *Garner*, the court found that the plaintiff's disruptive on-the-job activity, which included "missing a week of work due to a Driving Under the Influence charge," arriving to work late, failing to meet deadlines, producing unsatisfactory work product, and sending sarcastic emails (among other actions) were not protected activities under § 623(d).  *Garner*, 95 F. Supp. 2d at 1079.  And in *O'Day*, the court found that a plaintiff "rummaging through his supervisor's office for confidential documents," copying those documents, and then showing them to another co-worker who had been slated to be laid-off was on balance too disruptive to constitute protected behavior.  79 F.3d at 763; *see also Hellman v. Weisberg*,  No. 06-1465, 2007 WL 4218973, at *5 (D. Ariz. Dec. 3, 2007) *aff'd*, 360 F. App'x 776 (9th Cir. 2009) (plaintiff's release of confidential memoranda in violation of employee obligations was not a "protected activity" under Title VII).

### ii.    Adverse Employment Decision and Causal Link

At the prima facie stage, the causal link element is construed broadly, *Poland*, 494 F.3d at 1181 n. 2, and, in some cases, causation may be inferred "from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).  This is such a

1  case.  Defendant suspended Woodsford on or about September 17, and subsequently

2  demoted him. [9]  The temporal proximity between the adverse employment actions – all of

3  which occurred during the two weeks after Defendant's learning of the EEOC charge – is

4  sufficient evidence to establish causation here.

5                              **b. Defendant's Non-Retaliatory Purpose**

6        Defendant must "offer a legitimate, non-discriminatory explanation" for

7  Woodsford's suspension and demotion.  *Diaz*, 521 F.3d at 1211.  "The defendant need

8  not persuade the court that it was actually motivated by the proffered reasons, but it is

9  sufficient if the defendant's evidence raises a genuine issue of fact as to whether it

10  discriminated against the plaintiff."  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S.

11  248, 254 (1981).  However, the "explanation provided must be legally sufficient to justify

12  a judgment for the defendant."  *Id.* at 255.

13        Defendant's proffered non-retaliatory reason was Woodsford's "insubordinate

14  behavior."  (Dkt. no. 23 at 16.)[10]  Insubordination is generally a legitimate, non-

15  discriminatory reason for an adverse employment decision.  *See Payne v. Norwest*

16  *Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997).  The two potentially insubordinate activities

17  Defendant argues Woodsford took part in before its decisions to suspend and demote

18  _____

19        [9] Defendant offered Woodsford the position of shop foreman, transferred away
20  many of his job duties, and revoked a number of privileges.  ("Bob Woodsford's New Job
   Description," dkt. no. 25-2, at 46-48.)  Each of these adverse employment actions is
21  actionable under the ADEA.  Defendant presented Woodsford with each of these
   adverse employment decisions in a single employment package on the morning of
22  October 1, and Woodsford's objections and subsequent actions were made in response
   to the package as a whole.  For the purposes of deciding summary judgment, the Court
23  labels the entire October 1 employment package as Woodsford's "demotion."

24        [10] Defendant briefly discusses Woodsford's compensation as another reason for
   demoting him ("[b]ecause of the reduction in his pay plan, some of Woodsford's
25  extraneous duties were eliminated . . .".).  (Dkt. no. 23 at 8, ¶ 26.)  But this reason plainly
   cannot survive the pretext stage of the analysis, because when Woodsford was originally
26  told his compensation was reduced, he was also told his duties would remain the same.
   It was not until Woodsford filed the EEOC charge and spoke to co-workers about his
27  charge that Friendly demoted him.  These actions suffice to create a genuine issue of
   material fact regarding whether or not demoting Woodsford to make his duties in-line
28  with his compensation was a mere pretext for retaliation.

1   Woodsford were that (1) Woodsford spoke with co-workers about his EEOC charge and

2   (2) Woodsford stated that he no longer trusted or respected management.  (Dkt. no. 23

3   at 16; Dkt. no 25-2 at 53.)  Woodsford admits that he spoke with co-workers about his

4   charge on the job, but disputes that he ever told Friendly management he did not trust or

5   respect them.  Because "a court views all facts and draws all inferences in the light most

6   favorable to the nonmoving party," the Court therefore only considers the conversations.

7   *See Kaiser*, 793 F.2d at 1103.  Yet as mentioned, such conversations with co-workers,

8   so long as they are not overly disruptive to the workplace, are protected under the

9   ADEA.  Such ADEA-protected behavior cannot be defined as insubordination.

10  Woodsford's suspension and demotion were not guided by a legitimate, non-retaliatory

11  purpose. These two claims therefore survive summary judgment.

12              **2.      Woodsford's Oct. 1 Termination**

13          For the same reasons stated in section (C)(1)(a) above, a reasonable juror could

14  find that the temporal proximity between Woodsford's filing of the EEOC charge and

15  Defendant's terminating him establish a prima facie case of retaliation.

16          Further, Defendant's given reason for terminating Woodsford is legitimate.  As

17  mentioned, an employee's insubordinate behavior is generally a legitimate, non-

18  discriminatory reason for an adverse employment decision. *See Payne*, 113 F.3d at

19  1080.  Here, unlike the behavior that prompted Defendant to suspend and demote

20  Woodsford, Woodsford's behavior during the October 1 meeting – his heated words with

21  Haase and Young and his refusal to sign the new terms of employment – is not

22  protected by the ADEA.  Defendant's reason for terminating Woodsford is therefore

23  legally sufficient.

24          The burden shifts back to Woodsford to establish that Defendant's claim that it

25  terminated him for his insubordinate behavior was a pretext for retaliation.  A Plaintiff

26  must present "very little evidence" of pretext to survive summary judgment. *Stegall v.*

27  *Citadel Broad. Co.*, 350 F.3d 1061, 1072 (9th Cir. 2003).  "Because motivations are often

28  difficult to ascertain, such an inquiry should be left to the trier of fact since impermissible

1   motives are often easily masked behind a complex web of post hoc rationalizations."

2   *Reece v. Pocatello/Chubbuck Sch. Dist. No. 25*, 713 F. Supp. 2d 1222, 1231 (D. Idaho

3   2010) (citations and quotation marks omitted).

4        Woodsford has produced enough evidence for a reasonable juror to conclude that

5   retaliation was the but-for reason for Woodsford's termination. *See Smith v. Xerox*, 602

6   F.3d 320, 328 (5th Cir. 2010) (finding that the but-for causation standard applies to

7   retaliation under the ADEA). A reasonable juror could determine that Defendant was

8   attempting to use Woodsford's demotion to goad a negative, disruptive reaction out of

9   him and essentially provide Friendly with a legitimate reason for terminating Woodsford.

10  At 9:00 a.m. on Woodsford's first day back from a two-week disciplinary suspension,

11  Friendly presented Woodsford with a significant demotion – he would have fewer duties

12  and responsibilities, and would now share his post with a former subordinate. Further,

13  Defendant made Woodsford sign a document stating that the long-time employee and

14  former manager was not only being demoted but also had to surrender his keys and

15  company cell phone, was no longer trusted with Friendly's safe combination, had to

16  clock in and out, and lost other similar privileges. (Dkt. no. 23-4 at 22.) Coupled with

17  the fact that Woodsford had recently filed an EEOC charge against Defendant, a

18  reasonable juror could determine that the circumstances surrounding Woodsford's

19  termination demonstrate that Defendant purposefully backed Woodsford into a corner: it

20  attempted to anger Woodsford, then use this reaction against him by giving Friendly a

21  legitimate reason to terminate Woodsford. Merely because discriminatory retaliation

22  must be the "but for" reason for an adverse employment decision does not give an

23  employer carte blanche to pile on suspensions, demotions, and other adverse

24  employment actions in order to illicit a negative reaction out of the plaintiff and then use

25  this reaction against him.

26       Other evidence could lead a juror to find that Defendant's reason for terminating

27  Woodsford was pretextual. Defendant did not have a clear employment policy defining

28  insubordination. This is therefore unlike cases where employers had a policy that placed

1  employees on notice that certain behavior would lead to disciplinary action.  *See, e.g.,*

2  *McGill v. Munoz*, 203 F.3d 843, 847 (D.D.C. 2000). The lack of such a policy could lead

3  a reasonable juror to believe that Defendant's proffered non-retaliatory business reason

4  was a post-hoc rationalization for terminating Woodsford.   Finally, the fact that

5  Defendant waited until later in the day on October 1 to terminate Woodsford, and did not

6  terminate him when the potentially insubordinate behavior occurred or directly afterwards

7  could lead a reasonable juror to find that Defendant's decision to label Woodsford's

8  behavior was mere pretext for retaliation.

9  **IV.    CONCLUSION**

10         Accordingly, IT IS HEREBY ORDERED that Defendant's motion for summary

11  judgment is GRANTED in part and DENIED in part as follows:

12   • The Court grants the motion regarding each of Plaintiff's claims of age

13      discrimination;

14   • The motion is denied regarding Plaintiff's retaliation claims.

15  ENTERED THIS 27th day of June 2012.

16

17  _____

18  UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28